California Institute of Technology v. Broadcom and Apple 2020-22-22 Mr. Lee, good morning. Thank you, Your Honor. May it please the Court, my name is Bill Lee and together with my partner, Lauren Fletcher, I represent the appellants Broadcom and Apple. The trial court paid numerous legal errors that resulted in a billion-dollar verdict that's not supported, as we contend, by the law or the evidence. You've argued virtually all of those errors in almost a kitchen sink appeal. The trial court used that language. My opponent has used that language. There are some appeals that turn on an issue or two. There are some appeals that have a host of issues. This happens to be one of them. They include claim construction issues, damages issues, and substantial evidence issues. Notwithstanding the characterization made by Caltech, we would not bring those issues to you unless we thought they were real and significant. In my time today, what I'd like to do is focus on the claim construction and damages issues that, in fact, this really outsize judgment. If I could turn immediately to the term repeat, which has significance for all three of the patents. As you know, we contend the district court erred in construing repeat to include merely reusing bits. I don't understand the significance of that argument. I think I do understand your non-infringement argument, but I don't understand the significance of repeat and reuse. Your Honor, there are two separate issues, so let me come to both issues quickly. The repeat issue is significant because if you were merely reusing, you could not get the irregular duplication that the claims require. What's the difference between reusing and repeating? Repeating allows you to get multiple copies of the bit. If Your Honor turns to not only the claim limitations, but to columns two and three in each of the disclosed embodiments, all of the embodiments turn on the formula that's in column two, which is N equals QK. N is the output, K is the input, Q is the number of times of repeats. To be irregular, Q is going to have to vary in number. It could not always be one. If you were reusing, you could never have that formula irregularly repeat. So the answer to the first part of your question, Your Honor, is if you look at figure two, if you look at figure three, if you look at figure four, if you read the embodiments, they are all consistently predicated upon N equals Q times K. Q is a number that has to vary. It has to vary or you cannot have irregular repetition. And as a consequence, Your Honor, you have to have repeating, not reusing. That is precisely what the specification says. It's consistent with the claims. It's also what Judge Felser said in her pretty well-reasoned opinion on this very issue. So it has consequences. Your Honor, when you consider the fact that before the Patent Office, Caltech distinguished these claims from... I'm sorry. I just don't understand the difference, but I know time is limited. Could we turn to the infringement question? Sure. As I understand it, the Caltech theory in their expert testimony said because the output here is sometimes the same as the input, that that creates infringement, which seems to me questionable. And their theory, I guess, is that in some circumstances, the information bit passes through the process and ends up being the same at the end, but not always. How is it that this invention could work if only sometimes the information bit passes through and comes out the other end the same way? I thought the whole purpose of the invention here was to repeat all of these bits irregularly. Your Honor is exactly correct. And if you consider the record, which is extensive, there were three iterations of Caltech's infringement contention. The first was that all of the inputs to the AND gates, the 972, were the repeated bits. That didn't work because first, they were all the same. And the second, they weren't repeated. And the second is they weren't irregular. They were done 972 times like night follows day. So they changed positions. It said, no, no, no, it's the outputs. And when the outputs, in some circumstances, depending upon the parity matrix, depending upon whether the enable bit is set to 1, in those circumstances, there's a repeated bit. It makes no sense. The inputs are the same. The AND gate performs the same function. And all the inputs have to be repeated. All the inputs are the same. Okay, so where do I get from the specification or the claims the concept that all the inputs have to be repeated as opposed to occasional repeating of inputs? Your Honor, what you get is the claims require that the bits be repeated irregularly. And at the input end to the AND gates, they're not being repeated irregularly. They're all the same inputs. If you get to the outputs, they're all coming through the AND gate, just as Your Honor said. They are being output by the AND gates after the parity bit matrix, also called the enable bit, is applied. And there's an output. They're all processed the same way. And here, Your Honor, is, I think, the key to answering your question, which is before the district court, Caltech said, well, when the enable bit is 1, and then there's a repeated bit, but when the enable bit is 0, there's no enable bit. They have, as we've pointed out to you, at their brief at page 21 to 22, they have said exactly the opposite. Before the district court, they said, to sustain this billion dollar verdict, that when the parity bit is 0, there is no repeated bit. Before this court, they have come to you and said, no, no, no, no, that's not right. When the parity bit is 0, you can't have a repeated bit. It cannot be that those are reconcilable. They're irreconcilably inconsistent, and they really demonstrate, Your Honor, your point that pointing to some of the outputs is not very good. The testimony is pretty clear that they're suggesting sometimes infringement, sometimes if the information bit is sometimes repeated, that constitutes infringement. And my question is, how can that be? How can this work if it only gets repeated sometimes? How is that within the concept of the invention? It can't be. It can't be because the bits are treated the same way at the AND gate, the XOR gate, the OR gate. They're output after being processed the same way. This is not a circumstance where there are certain settings to the chip, and the settings can give you different results and different functionality. This is the same. And the best indication is twofold. One is that wasn't their initial contention. Their initial contention sort of recognized the problem of saying, well, sometimes it's repeated, sometimes it's not, by focusing on the inputs to the AND gates. But they recognized that that didn't fit because they're not irregular. They then switched to trial and said, well, sometimes it is and sometimes it isn't. But it's only in those circumstances where the enable bit is 1. And their expert explicitly said, Your Honor, that when the enable bit is 0, there is no repeated bit. If you look at their brief at page 21 to 22, they give you precisely the same example, but they reach precisely the opposite conclusion. That can't sustain a verdict. And actually, Your Honor, to go to your point, there is no dispute about how the chip works. There is no dispute about how the bits are processed. When you look at the undisputed evidence, there's simply no infringement here. And that's true no matter what you do with the claim construction of repeat. It's the manner in which your two questions converge. Let me say one more thing and then use a couple minutes to address damages. On the 781 patent, the term repeat is not used, nor is the term irregular repeat. Your theory is that at summary judgment, they ask that the 781 be construed to include that requirement, and I guess as a result of judicial estoppel or whatever, that they're stuck with that. Your Honor, we don't claim judicial estoppel. We don't need to go that far. What we say is they made that contention, and the district court adopted that contention. They agree today that they've made that contention, and it's correct. Our position is the court that we then asked to instruct the jury that that was the meaning of the claim, and there was no instruction. And the only answer to Your Honor's is, well, there was a stipulation that that's a correct construction. And what we would say- The instruction would be harmless error if they were right on infringement of the 710, right? Your Honor, if they were right on reuse, it still would not be a harmless error, because the jury did not understand the breadth. The jury could have misconstrued the breadth of the claim. And so it still would be error. If the jury found that element satisfied as to the 710, and if that were correct, then why wouldn't the jury have reached the same conclusion with respect to the 781 if they'd been properly instructed? Your Honor, because of the manner in which the trial unfolded, which was their expert saying that the patent, 781 patent, didn't require irregular repeating. Then our expert got up and gave all his testimony on all the patents, including the 781, and said it requires irregular repeating. Then their expert came back and said, no, no, no. The 781 doesn't have those words. It's not required. Exactly the opposite of what they said. I don't think you're addressing my contention about why is it that if properly instructed, and I think you have a strong argument that they should have been instructed, but if properly instructed, why would they have reached a different conclusion with respect to the 781 as opposed to the 710 on this issue? The answer to the question is, are experts reliant on the fact that irregular repeat was required in the 781, was used to attack his opinions across all of the patents? And on rebuttal, they came back and said, the 781 doesn't require it. And then in closing, they said, oh, the 781 doesn't require it. Look at what their expert said. You can disregard everything he said on all the patents. So they used it to attack their expert. Yeah. It's the prejudice as the trial unfolded. I know I'm in my rebuttal time. Let me make three quick points on damages. These two hypothetical negotiations that are offered to the court there's no precedent for them. There's no evidentiary basis for them. They are inconsistent with all the apportionment rules this court has articulated. The requirement that the entire market value will not be violated, the smallest sample unit. These are the same chips with the same functionality made by the same manufacturer sold, for the most part, for use in the same end product. But if those end products were never imported in the United States, the royalty is one fifth of what they claim Apple should pay. You can't reconcile that with any of those fundamental precepts of apportionment law. Point two, you can't solve that by claiming that there are comparable agreements. The Caltech agreement with Hughes is not comparable. It says on its face it shouldn't be used for a hypothetical negotiation purpose. It deals with a different technology and, in fact, excludes the technology of the hypothetical negotiation. It's at a different point in time by five years, for sure. None, and perhaps most importantly, it's a $5 million lump sum, not a running royalty. You can't claim that that's comparable. But even if you did, you have to apportion to address those differences. Last point, even if you ignore all of that and you get to Dr. Teiss' imputed royalty rates, he had two bases for increasing the Broadcom rate and the Apple rate. In both circumstances, his predicate for increasing those was excluded at trial. Excluded. He had no other basis. Yet he went ahead and said, well, it's OK. We're going to increase them on a qualitative basis. That's insufficient under this court's precedent. And I'll reserve my 40 seconds. We won't save you your full rebuttal time because there's a lot of issues. Morning, Ms. Sullivan. Good morning. Good morning, Your Honors, and may it please the court. Kathleen Sullivan for California Institute of Technology. The court should affirm there was no legal error. Any possible legal error? Before we get to some of the infringement questions, the district court basically said that our decision in Shaw with respect to the invalidity contentions and the estoppel resulting from the IPR had been overruled by SAS. That seems to me to be pretty problematic. Not so, Your Honor. May I distinguish the cases? Yeah, go ahead. In Shaw, this court said that arguments for invalidity to the board that had been petitioned for in an IPR but had not been instituted did not give rise to estoppel. Our case is different, so Shaw does not control. Because in our case, the judge excluded arguments about validity that could have been made in the petition but were not. Yeah, but the reasoning of Shaw is that what could have been raised is not could have been raised in the petition but could have been raised once the IPR was instituted. And the district judge ignored that rationale and basically dismissed Shaw because of SAS. And it just doesn't seem to me that that's correct. Even under SAS, there's no requirement of institution. You can have situations in which there is institution and they dismiss the institution or they never institute in the first place. So there are situations in which the unpatentability contentions won't have been addressed at all. But how could it be that there was an intention to create an estoppel under those situations? So Your Honor, we think that the majority of district court decisions trying to figure out what SAS means for non-instituted grounds, non-petition grounds, is correct. The district court cited the majority of decisions at appendix pages 42 to 50. Your Honor, SAS makes Shaw unlikely to recur because now any petitioned grounds must be instituted. But this case is different and not controlled by Shaw. Because here, the problem is that the defendants knew about the Luby 97 and 98 and Richardson 99 references. There's no dispute about that. And they withheld them from their petition. They are now foreclosed by what we think is the plain language of the statute, Your Honor. We think 350 and 82 estops new invalidity grounds that defendants reasonably could have raised in their IPR petitions because the emphasis is on raised. And they could have raised grounds they knew. But it's like collateral estops. If we stuck with the rationale of Shaw, you'd lose, right? Well, Your Honor, Shaw said that it, if I could make the analogy, Your Honor, I'm going to run out of time for addressing the other issues. So I hope I make that more clear. If we stuck with the rationale of Shaw, you would lose. Your Honor, if the rationale of Shaw is that institution is a moment in time when the proceeding begins, then yes, we would lose. But we don't think that's key to Shaw. We think it's just like collateral estoppel, Your Honor. In collateral estoppel, the party is precluded in future cases from raising those grounds it raised or could have raised in another proceeding that reached finality. There's an exception, of course, if you jurisdictionally could not have raised those issues in the prior case. You were barred, and that turned out to be wrong. It would be unfair to estop you for reasons that were not your fault. Here we read 315E2 exactly the same. You are estopped if you raised or could have raised the grounds for invalidity in the prior proceeding. You are estopped. You're only excused if there was some reason beyond your control that prevented you from raising them. And here the- I want to ask you about damages. Yes, Your Honor. About this hypothetical negotiation. It is hypothetical. It wasn't an actual negotiation where people agreed to these things. Now, what reasonable seller to the public would agree to such a different royalty rate for its supplier when the supplier indemnified the seller? I mean, these royalty rates do not seem reasonable. They don't seem rational. So, Your Honor, it's entirely reasonable for there to be two different royalty rates for two different defendants selling two different products at two different places in the supply chain in the same line. Yes, Your Honor, because the hypothetical negotiation is a construct. It is a defendant-specific construct. Georgia Pacific looks to a host of factors that are specific to the relationship between the willing licensee and the willing licensor. Factors 2, 5, 6, 11, they all say, look at the defendant. And, Your Honor, when we're in that hypothetical negotiation here, there were two negotiations, one with Broadcom, one with Apple. We're not thinking during those separate hypothetical negotiations about, well, might there be indemnification or might there be carve-outs. We're not thinking about that because we're deciding, what would the willing licensor, Caltech, require of a willing licensee? Broadcom as a tub on its own bottom and Apple as a tub on its own bottom. The answer is different rates. But the Apple chips are provided by Broadcom. I mean, you might have a situation in which you had two different defendants making two different products, which would end up with a different royalty rate. That's not our situation. It's the same chip. And you're saying that some of the Broadcom chips require a higher license fee than others. I have difficulty understanding how that could be the case. Your Honor, imagine if it were two separate cases. If these cases hadn't been tried together, there wouldn't be any argument that the Caltech Hughes license, which is highly comparable because it involves the technology in this case, would have led a reasonable hypothetical negotiation rate to be the rate calculated beginning with the Caltech Hughes license. Similarly, if we were over in a separate case and there was a hypothetical negotiation being discussed between Caltech and Broadcom, we would have looked to the CSIRO Broadcom license as the starting point. Those real world licenses, Your Honor, are the best evidence that it is reasonable to suppose that the same chips sold to a manufacturer on the one hand and supplied to an end user on the other hand will command different rates. The starting points were five times different. And Your Honor, the apportionment reference my friend on the other side made is irrelevant here because this, like CSIRO against Cisco, like Elbit, this is a case where we're looking at comparable benchmark licenses to calculate the rate. We're not looking to a royalty base we then have to apportion. And so the very fact that the real world licenses, the Hughes Caltech license, had an imputed royalty rate five times, the royalty rate imputed from the CSIRO Broadcom license shows that end user licensing will command a different value in a hypothetical negotiation than component licensing, even if the component later goes into the calculation. And Your Honor, I do want to distinguish laser dynamics. This isn't an imputed infringement case where we might think that the direct infringer should pay the same rate as the person found to have been induced to infringe. Sorry, induced infringe. It's not an induced infringement case. Here the jury was allowed to find direct infringement against both defendants. There was no request by the other side to particularize the verdict form into indirect or direct infringement. And for all those reasons, Your Honor, this isn't a case where you should think about the negotiation as having an indemnification aspect or a carve out aspect. Your Honor, I think we, so if you imagine this as two separate cases, we wouldn't be here. We wouldn't think there was any problem with looking at the Hughes license for Apple and the CSIRO license for Broadcom. And I think it would be very surprising if this court were to announce that a patentee who enjoys a legal monopoly is legally obligated to offer the same royalty rate to all bargaining partners, that sometimes different cases come out differently and they're inconsistent, but that within the same case, you want the approach to be consistent. And that's the problem here. It seems not to be consistent to say here that some of the Broadcom chips get one license and the rate and the others, which are absolutely identical, get a different rate. Your Honor, there is no legal precedent that forecloses two different rates to two different defendants in the same case. Laser dynamics doesn't apply. This isn't an entire market value apportionment case. This isn't a first sale exhaustion case. They don't have a single case. Of course, the Court of Appeals doesn't need a legal precedent. Exactly, Your Honor. It needs no contrary law. Correct, Your Honor. There's no law that forbids what happened here. So that means we're in the world of substantial evidence, Your Honor. And stunningly, Mr. Lee has gotten up today and- I thought there was a legal issue here. I would contend, Your Honor, there is no legal bar to having two separate royalty rates for two separate defendants where it's based on justified comparable licensing methodology, where the comparable licenses involved two different rates. And Your Honor, then the question just becomes, is the damages judgment supported by substantial evidence? And it clearly is. Mr. Lee got up today and started making jury arguments that were conspicuously not made at trial. OK, could I, before, unless Judge Lurie or Judge Lynn have other questions on this damages issue, before we run out of time, I wanted to talk to you about infringement. Because it seems to me pretty clear that the theory is that because some of the information bits are the same at the end of the process, some of them, that creates infringement. And it's a sort of a sometimes infringement argument. We don't even know how often that happens. I have difficulty in understanding how the idea that the bits only occasionally get repeated brings them within the claims here. And would you please explain to me how that is consistent with the invention and with the language of the patent, which doesn't say anything about occasional bits being the same at the end of the process as the input? Why is that infringement? How can that be infringement under this patent? Under your theory, it could happen 1% of the time, and it would still be infringement. Not so, Your Honor. Let me explain. The evidence clearly supports the finding of infringement. Because exactly what you observed, Your Honor, that not every information bit that is input into the repetition, permutation, summation, accumulation process in these encoders, not every bit is repeated the same number of times. That is the invention, Your Honor. No, no, no, no, no. Not the same number of times. It doesn't get repeated at all. Because in some percentage of the cases, which could be 99%, they don't get repeated at all. Your Honor, the invention is irregular repetition, meaning the information bits are repeated an irregular number of times. I think it would help if we- But still repeated. And your problem is that under your own testimony, your witnesses admitted that they don't always get repeated. Sometimes, could be many times, they don't get repeated. That's not correct, Your Honor. I wonder if we could look to the blue brief at page 29, to the chart. Maybe I can clear some of this up. This is a picture by the defendants of what is happening when the information bits are input. And then some are enabled, some are allowed to be repeated at the end. And Your Honor, as Mr. Lee and I agree, when the enabled bit, when the parity check bit is set to one in the center column, then the information bit that is input into the encoder is passed through to the output. So on lines two, information bit zero passes through an enabled gate, parity check bit one, and comes out as zero. And sometimes it is not repeated. It is repeated in lines two and four. But sometimes it is not repeated. Correct. Because your witnesses testified, right? Correct, Your Honor. But that's what makes it irregular repetition. It means repeated an irregular or unequal number of times. But it still has to be repeated. And then we have a situation which is not repeated at all. Your Honor, every bit is sent into the process. Every bit is input. The outputs at the end allow the information bit to pass through an irregular number of times. It is that process that creates the ability to detect errors in the messages and to override them, to correct them. So there is nothing in the claims that require that every bit that goes in, every information bit that goes out, is an output. What matters is that they are repeated an irregular number of times. And the testimony was clear. I can refer your honors to the sites. Is it not true that under your own testimony, some of these bits are not repeated at all? Not every bit passes through. Every bit is repeated. Every bit enters the process and is scrambled. And some are output at the end of the day. That's what makes it irregular. Is it not true that your witnesses testified that some bits are not repeated at all? No, Your Honor. Our witness testified that all bits are repeated. All inputs, all bits are repeated. Not every output of the process has the information bit as the output at the end. It doesn't require that all input bits be output. Let's put it this way. Suppose we conclude that, in fact, what I said is correct. That not all of the bits are repeated. Do you agree, then, that there is non-infringement? The bits are repeated an irregular number of times. No, no, please answer my question. If I am correct, and that the testimony of your witnesses is that not all of the information bits are repeated, do you agree that there is no infringement? Yes, but that is not what the testimony was. The testimony was not that not all bits are repeated. The testimony of the expert, which is reviewed, which is summarized at red brief 22, was that all the products output information bits between three and 12 times. That is an unequal number of times. They are all repeated, your honor. They are all reused in the process. You can see this easily in the 032 patent in claim 11 in the Tanner graph, or in the Tanner graphs in the other two patents. They show that the information bit being input is repeated an unequal number of times. The repetition happens when the information bits are input. The fact that they are not all output at the end of the repetition, permutation, summation, and accumulation process, the fact that they are not all output does not mean that they are not all repeated. They are all reused. All of them, and your honor, we agree, first of all, that the claim construction was that repeat means reuse or duplicate. So you're right, nothing turns on Mr. Lee's suggestion that it should be exclusively limited to duplicate, which would violate the claim meaning of the claim. All of the bits are repeated in the sense of reused. If I could call your attention to the Tanner graph, it's easily accessed in the red brief in the front matter. It shows the information bits being repeated an unequal number of times. Infringement, the bits being repeated, an irregular or unequal number of times. Information bits U1 are repeated twice. Information bits below that are repeated three times. Information bits down below further are repeated four times. The repetition, please don't, your honor, equate the fact that not every information bit is output at the end with the notion that they're not being repeated. The fact that they are repeated an irregular number of times is what creates the error correction technology. That was the advance here. We had repeat accumulate codes before. We didn't have a regular repeat accumulate codes before, and that was the invention. So your honor, we think that the substantial evidence plainly supports repetition. It would do under our construction or theirs, but the district court's construction was correct. Your honor, I'm conscious that I'm over my time. Yes, well, thank you. I don't think we have more questions for you. Mr. Lee, take three and a half minutes, please. Your honor, do you want any response on the 781 instructional error? I think you're right. It's harmless. It's harmless not only for the reasons, Judge Dyke, that you gave. First of all, it wasn't error because the claim plainly sets forth what variable number of subsets means. And your honor, in a- You asked for the construction that read in the irregular repeat requirement, right? No, your honor, there was- In connection with the 101 issue? Your honor, the only point I wanted to make about why it's- No, no, no, no, no. I'm sorry, I don't understand the question, your honor. OK. Did you not, in connection with the 101 issue, ask for a construction of the 781 that included irregular repeat? Included irregular repetition? Yeah. Yes, we did, your honor. And we don't dispute that irregular repetition is required. So why shouldn't the district court have instructed the jury that that was a requirement? Because it was already clear from the patent, your honor. And he didn't want to confuse it by connecting it to the 781. Clear from the patent? Yes, your honor. That was the ruling. We think it's fair. But your honor, I want to just point out that our experts said to the jury, this is the irregular repetition part. So there can't be prejudice. It's harmless error. Because we didn't argue it wasn't irregular repetition. So there's no instructional error on the 781. And if there was, it was harmless. Thank you. Thank you, your honor. We have your argument. Mr. Lee, you have up to four minutes if you need it. Yes, your honor. Just four points. Let me start with the infringement point. Judge Dykstra, to your question, their expert testified that only sometimes were the bits repeated. And that's at pages 3033, 3041. And they're explicitly asked that question at 3036. So we take Ms. Sullivan at her word, which I do, which is if it's only repeated sometimes, there's no infringement. There is no infringement here. And the infringement theory I heard today is, again, different than even the one that's in the briefs. And I would just ask the court to consider their brief at page 21 and 22 and compare it to A3038, where literally what they say in the brief to you is the repeated bit is the opposite of what they said at trial. It cannot be that that sustains a verdict of this magnitude or any verdict. Second point, on Shaw, the chronology is important. Section 315E2 is enacted saying during an inter-parties review. Shaw's decided. There's no question that it means during inter-parties review, not in the petition. And the district courts read it consistently. SAS is decided. But Congress doesn't change the language to end the petition. The district court changes it, in his opinion. But Congress didn't change the statute. The courts, the district courts cannot change the words of the statute simply because they think it might not be as necessary now. And there are still circumstances where it's necessary. On damages, just two points. There was an inducement claim. The specific claim was that Broadcom induced Apple to infringe. It is very much like the Lewiston case. And then the answer to Ms. Sullivan's question about two cases is threefold. There weren't two cases. There's a single case with the same product, with the same functionality, made by the same manufacturer, sold to the same end products for the most part. And the only difference is where they were sold. It's the same case. And the incremental value should be the same. The second answer to her question is she kept saying that you start with the end value of the product. No, the entire market value rule says you cannot do that. That's why the entire market value rule exists. That's why the smallest saleable unit rule exists. And the fact they claim the Hughes Caltech license is comparable, which it's not, excuses that adherence to the apportionment principles that the Supreme Court in this court requires is really nonsensical. Thank you, Your Honor. Thank you, Mr. Lee and Ms. Sullivan. Case will now be taken on the submission.